**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEREMY D. CAIREL and MARVIN JOHNSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 09 C 1878 |
| | ) | |
| CHICAGO POLICE DETECTIVES JACOB ALDERDEN, STAR NO. 20431, PATRICK JOHNSON, STAR NO. 20637, and LUIS OTERO, STAR NO. 21016, and the CITY OF CHICAGO, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Before the court are the defendants' joint motions for summary judgment.[1]  For the reasons explained below, we grant the defendants' motions.

**BACKGROUND**

Plaintiffs Jeremy Cairel and Marvin Johnson have sued the defendants for alleged constitutional violations, malicious prosecution, and intentional infliction of emotional distress ("IIED") stemming from their arrest and prosecution for robbery and impersonating police officers.  Before discussing the facts, we

---

[1]  We gave the defendants leave to file a "supplemental motion" for summary judgment to assert their argument that the plaintiffs' claims are time-barred.  (See Dkt. #126.)  For the sake of convenience, we will address the defendants' arguments as if they had raised them in a single motion.

must address the plaintiffs' evidentiary objections to the
defendants' Rule 56.1 statement.[2]

A.    **The Defendants' Reliance on Police Reports**

The plaintiffs have asked us to strike paragraphs of the
defendants' Rule 56.1 statement as improperly based on hearsay
contained in police reports. (See Pls.' Resp. to Defs.' Stmt. ¶¶
1, 2, 16, 18, 21, 24-27, 29-31, 40-42, and 52-53); see also Fed. R.
Civ. P. 56(c)(2) ("A party may object that the material cited to
support or dispute a fact cannot be presented in a form that would
be admissible in evidence."). The defendants respond that the
police reports are admissible as public records. In a civil case,
a record describing a matter that a police officer observed while
under a duty to report is admissible. See Fed. R. Evid. 803(8).
One of the challenged statements, paragraph 27, falls within this
exception. (See Defs.' Stmt. ¶ 27 ("Detective Alderden contacted
the Felony Review Unit of the Cook County State's Attorney's
Office. Assistant State's Attorney Elizabeth Ciaccia
responded.").) But a statement "is not admissible merely because

_____

[2] After the plaintiffs filed their response to the defendants' Rule 56.1
statement, the defendants filed a "Response" to the plaintiffs' response. (See
Dkt. # 112.) The plaintiffs moved to strike this document because Local Rule
56.1 does not contemplate a further response from the moving party. We denied
the motion to strike, but said that we would allow the plaintiffs to file a
another brief if we felt that the defendants had unfairly raised new issues. We
now conclude that a further brief is unnecessary. The plaintiffs' response to
the defendants' Rule 56.1 statement asks us to strike several responses on
evidentiary grounds. If the plaintiffs had raised their objections in a separate
motion to strike, we would have given the defendants an opportunity to respond.
So, we conclude that the defendants' response is appropriate insofar as it
addresses the plaintiffs' evidentiary objections. We will not consider any non-
evidentiary arguments raised in that filing.

[it is] contained in a police report." <u>Parsons v. Honeywell, Inc.</u>, 929 F.2d 901, 907 (2d Cir. 1991). Statements to law-enforcement officials described in the report, and offered for their truth, are not admissible unless they fall within another hearsay exception. <u>See</u> <u>id.</u> ("It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted but that statements made by third persons under no business duty to report may not.") (citation, internal quotation marks, and emphasis removed). But in this case, the defendants have offered most of the challenged statements for their effect on the defendants — whether they created probable cause to charge the defendants for robbery and impersonating a police officer — *not* for their truth. <u>See</u> <u>Woods v. City of Chicago</u>, 234 F.3d 979, 986-87 (7th Cir. 2000) ("[T]he defendants offered the statements in the arrest report and the verified criminal complaint describing the details of the alleged altercation between Woods and Flores not for their truth, but to show the effect that the statements had on the officers."); (<u>see</u> Defs.' Stmt. ¶¶ 16, 18, 21, 24-25, 26, 29, 30-31). The plaintiffs have expressly or implicitly admitted the other challenged statements. (<u>See</u> Defs.' Stmt. ¶¶ 1 (describing a robbery that the plaintiffs effectively admit occurred in their statement of additional facts at paragraph 23); 41-42 (stating the charges against the plaintiffs); <u>see also</u> Pls.' Resp. to Defs.' Stmt. ¶¶ 52-53 (raising hearsay objections, but admitting the

substance of the statements).)  The plaintiffs' request to strike certain paragraphs of the defendants' Rule 56.1 statement is denied.

## B.    **The Plaintiffs' Arrest and Prosecution**

On December 21, 2006, Elias Arias reported to the Eighth District Police that he had been pulled over, searched, and robbed by three individuals claiming to be police officers.  (See Defs.' Stmt. ¶ 1.)  Joseph Micetich contacted police officers on January 23, 2007 to report a similar crime: two people claiming to be police officers pulled him over and robbed him at approximately 11:00 p.m.  (Id. at ¶ 2.)  Micetich followed the culprits' car to a nearby house and notified the police of their location.  (Pls.' Stmt. of Add'l Facts ¶ 26.)  Police officers, including James Blaszczyk, entered the house and arrested an individual named Gumaro Delamora for drug and gun possession.  (Id.; see also Dep. of James Blaszczyk, attached as Ex. 11 to Pls.' Stmt. of Add'l Facts, at 62, 65; Alderden Dep., attached as Ex. 4 to Defs.' Stmt., at 41 (stating that the he believed Delamora was arrested for drug and gun possession).)  Police officers did not show Delamora to Micetich even though he matched the description that Micetich had provided for one of the robbers.  (Pls.' Stmt. of Add'l Facts ¶ 26.)  During roll call the following day — January 24, 2007 — the Eighth District watch commander announced that three or four males had recently committed a string of robberies in the area by pulling

cars over on the pretense that they were police officers. (<u>Id.</u> at ¶ 3.)

That evening Cairel, Johnson, and Eric Moore — employees of a repo company named F3 Solutions — were attempting to repossess a white Ford Ranger on Chicago's south side. (<u>See</u> Defs.' Stmt. ¶ 4; Pls.' Stmt. of Add'l Facts ¶¶ 12, 17-18.) Moore and Cairel were in one car, Johnson was alone in a second car. (Defs.' Stmt. ¶ 4.) At approximately 11:00 p.m., Officers Blaszczyk and Guillermo Cerna saw the plaintiffs' vehicles: (1) fail to stop at a stop sign at 47th or 48th Street and Kedvale, and (2) use an alley as a throughway. (<u>Id.</u> at ¶ 7.) They stopped both cars and obtained identification and proof of insurance from the drivers. (<u>Id.</u>) Moore was wearing a bulletproof vest, a Maglite flashlight, a "duty belt," and a badge around his neck that said "loss prevention and recovery." (<u>Id.</u> at ¶ 10; <u>see also</u> Pls.' Resp. to Defs.' Stmt. ¶ 10.) The plaintiffs had F3 Solutions identification badges and repossession orders with them when they were arrested. (<u>See</u> Pls.' Stmt. of Add'l Facts ¶ 12.) Johnson told Officer Blaszczyk that they were in the area to repossess a car for F3 Solutions. (<u>See</u> Defs.' Stmt. ¶ 8.)

Micetich — the victim of the robbery the night before — "showed up" at the scene. (<u>Id.</u> at ¶ 10.) The parties dispute whether, at the scene of the traffic stop, Micetich positively identified the plaintiffs as the individuals who had robbed him.

Two officers at the scene say that Micetich did identify the plaintiffs. (Id.; see also Lepkowski Decl., attached as Ex. 23 to Defs.' Stmt., ¶ 4; Cairel Arrest Report, attached as Ex. 10 to Defs.' Stmt., at FCRL000008.) Micetich states that he "recognized Jeremy Cairel and Marvin Johnson right away. Seeing them made me angry, and I stated loudly enough for everyone present to hear that [they] were the men who had robbed me the previous evening." (Micetich Decl., attached as Ex. 30 to Defs.' Stmt., ¶ 13.) On the other hand, Moore contends that he overheard Micetich expressing doubts about whether Cairel and Johnson had robbed him. (See Moore Aff., attached as Ex. 1 to Pls.' Stmt. of Add'l Facts, ¶¶ 13-14; see also id. at ¶ 15 ("At no time did Mr. Micetich identify Jeremy Cairel or Marvin Johnson as the individuals who robbed him the night before.").) Moore's affidavit creates a factual dispute about whether Micetich made a confident, unambiguous identification at the scene of the traffic stop. But there is no evidence that Micetich ever stated that Johnson and Moore were *not* the perpetrators. (Cf. id. at ¶¶ 13-14 (Quoting Micetich: "I'm not so sure about the black guy [Johnson];" "I'm not sure about the tall guy [Cairel], he didn't have a hat on;" "I'm not sure about his [Cairel's] glasses").) At approximately 11:15 p.m., Cairel, Johnson, and Moore were arrested and transported to the Eighth District police station. (Defs.' Stmt. ¶ 12.)

Defendant detectives Alderden and Johnson were assigned to the case that evening. (Id. at ¶ 16.) They first briefly interviewed Blaszczyk and Cerna, who told Alderden that Micetich had identified the plaintiffs as the individuals who had robbed him the night before. (Id. at ¶ 16.) The plaintiffs purport to dispute this fact, again citing Moore's affidavit. (See Pls.' Resp. to Defs.' Stmt. ¶ 16.) But Moore has not testified — and could not testify — about what Blaszczyk and Cerna told Alderden. When Alderden interviewed Micetich later that same evening, Micetich identified Cairel and Johnson as the robbers. (See id. at ¶ 18.) Again, Moore's affidavit does not contradict evidence that Micetich told Alderden that Cairel and Johnson robbed him. (See id. ("Micetich added that he is absolutely sure that the two offenders who he identified, Cairel and Johnson[,] are the same who robbed him."); cf. Pls.' Resp. to Defs.' Stmt. ¶ 18.)

Alderden then interviewed Cairel. It is undisputed that Cairel was "scared, nervous and crying" while Alderden and Johnson interrogated him. (See Pls.' Stmt. of Add'l Facts ¶ 9.) He initially (and repeatedly) denied having robbed anyone. (Id. at ¶ 10.) But he later told the detectives that he, Moore, and Johnson had robbed an individual fitting Micetich's description the night before, and confessed to other robberies as well. (See Defs.' Stmt. ¶ 21.)

Cairel has been diagnosed with a learning disability, cerebral palsy,[3] attention deficit disorder ("ADD"), and attention deficit and hyperactivity disorder ("ADHD"). (<u>See</u> Pls.' Stmt. of Add'l Facts ¶ 1.) During this litigation, Cairel was evaluated by the defendants' experts and received a verbal IQ score of 75, within the "Borderline-Low Average" range. (<u>See</u> <u>id.</u> at ¶ 7; <u>see also</u> Halaris Dep. at 28 (explaining that "75 is the average. It can be as high as 90 or as low as 60."); Report on Jeremy Cairel, dated May 21, 2013, attached as Ex. 10 to Pls.' Stmt. of Add'l Facts, at 2.) Cairel scored a 70 on a subtest of verbal "comprehension," which measures an "individual's ability to deal with abstract social conventions, rules and expressions (e.g., Why should people pay taxes?, Name some reasons why food needs to be cooked?)." (Report on Jeremy Cairel at 2.) Dr. Halaris's report describes Cairel's "comprehension" score as "significant[ly] lower and reflective of the Mentally Impaired range relative to his other scores." (<u>Id.</u>) Dr. Halaris concluded that Cairel's mental impairment could have caused him to confess falsely (without opining on his actual guilt or innocence). (Pls.' Stmt. of Add'l Facts ¶ 6; <u>see also</u> Report on Jeremy Cairel at 3-4.) The main point of contention between the parties is whether Cairel *appeared* mentally impaired to the defendants. The plaintiffs rely on

---

[3]/ The defendants' expert, Dr. Angelo Halaris, testified that "cerebral palsy" is a "vague" term denoting a "brain dysfunction." (<u>See</u> Halaris Dep., attached as Ex. 4 to Pls.' Stmt. of Add'l Facts, at 24-25.) According to Dr. Halaris, Cairel's condition manifests as a "learning disability" and does did not affect his motor skills. (<u>Id.</u>)

testimony from Cairel's criminal defense attorney, Andrew Weisberg,
for the proposition that Cairel "has a hard time expressing himself
and can appear very slow." (See Pls.' Stmt. of Add'l Facts ¶ 3.)
The defendants deny that he appeared "slow" *to them*. (See Defs.'
Stmt. ¶ 43; see also id. at ¶ 33 (the Assistant State's Attorney
("ASA") who interviewed Cairel testified that he did not "appear to
be slow").) Dr. Halaris and Dr. Susan Hill, who performed Cairel's
neuropsychological examination, both concluded that his mental
impairment would not have been apparent to the defendants:

> A reliable assessment of Jeremy's cognitive processes,
> emotional responsiveness and behavioral reactions could
> only be achieved after extensive evaluations by trained
> and experienced specialists in psychiatry and
> neuropsychology. Consequently, neither the State's
> Attorney nor Chicago Police Detectives Jacob Alderden
> or Patrick Johnson could have been able to assess Jeremy's
> ability to comprehend the content, significance and
> serious consequences his statements would cause.

(Report on Jeremy Cairel at 4.)

> Jeremy Cairel's test results are consistent with AD/ADHD
> and a learning disability however, his cognitive
> deficiencies are not at a level that would make them
> obvious to a lay person. Mr. Cairel's symptoms related
> to these diagnoses would be most apparent within an
> academic and/or vocational setting. It would not be
> reasonable to expect that detectives or prosecutors
> interacting with Mr. Cairel would have been able to
> detect his cognitive limitations nor be able to
> differentiate that his intellectual capacities could be
> significantly below that of other arrestees.

(Neuropsychological Eval., attached as Ex. 36 to Defs.' Stmt., at
5.)

The defendants contend that after obtaining Cairel's
confession, Alderden told Johnson about what Cairel had said and

invited him to speak to Cairel. (Defs.' Stmt. ¶ 25.) According to Alderden, Johnson then corroborated Cairel's confession and admitted his own role in Micetich's robbery. (Id.) Johnson denies that he ever confessed to any robberies while he was in police custody, (see Pls.' Resp. to Defs.' Stmt. ¶ 25), although he later pled guilty in exchange for probation. (See id. at ¶ 38.) Finally, Alderden interrogated Moore in the very early hours of January 25, 2007. (See Case Supp. Report, dated Feb. 23, 2007, attached as Ex. 12 to Defs.' Stmt., at FCRL000147.) Moore denied committing any robberies and gave Alderden an alibi for all three suspects: they were delivering repossessed cars to Matteson, Illinois when Micetich was robbed. (See id. (Alderden's report stating that Moore told him that he and the plaintiffs were in Matteson at 10:30-11:00 p.m. on January 23, 2007).)

While the plaintiffs and Moore were still in custody, detectives — including defendant Detective Luis Otero — went to F3 Solutions and recovered paperwork related to the suspects' employment. (See Pls.' Stmt. of Add'l Facts ¶ 19.) Employees at F3 Solutions corroborated Moore's statement that he, Cairel, and Johnson had transported repossessed cars to Matteson on January 23, 2007. (See id.) But as far as we can tell, there was no evidence — other than Moore's statement to Alderden — establishing that the plaintiffs were in Matteson at the particular point in time when Micetich was robbed. The plaintiffs have not given us any of the

records that Otero obtained from F3 Solutions, and the records that the defendants have provided are not time-stamped. (See F3 Solutions Documents, attached as Group Ex. 4 to Defs.' Resp. to Pls.' Stmt. of Add'l Facts., at Bates No. 000017.).)[4] Moore states that two individuals affiliated with F3 Solutions told him that Otero attempted to intimidate them. (See Moore Aff. ¶ 23 ("After I was released from custody, Heather Johnson told me that Detective Otero 'threatened to arrest her and place her children in D.C.F.S. custody if she did not cooperate with the investigation.'"); see also id. ("Detective Otero also told Mike Harazin, the owner of F3 Solutions, that I had confessed to impersonating a police officer in order to rob individuals and that I have Mr. Harazin a cut of the money.").) Even assuming that these statements would be admissible at trial, they are immaterial. There is no evidence that the plaintiffs were prejudiced in any way by Otero's alleged tactics — the witnesses all tended to corroborate Moore's alibi.[5]

Later on January 25, 2007, Elias Arias identified Cairel out of a six-man lineup — the other participants were Moore and four white, male police officers — as one of the individuals who had

---

[4]/ Many of the documents included in the defendants' group exhibit are immaterial (e.g., W-9 forms). There are three "Orders of Repossession" assigned to "EricM," (see F3 Solutions Documents at 000009-000016), and a report that appears to indicate that "EricM" recovered four vehicles on January 23, 2007. (See id. at 000017.)

[5]/ The same goes for Moore's statement that Otero attempted to conduct a warrantless search of his room at his father's house. (See Moore Aff. ¶ 22.) The plaintiffs were not prejudiced because there was no search: Moore states that his father turned Otero away. (See id.)

robbed him approximately a month earlier. (<u>See</u> Defs.' Stmt. ¶ 26.) The plaintiffs "deny Cairel was identified." (<u>See</u> Pls.' Resp. to Defs.' Stmt. ¶ 26.) But they cite only Cairel's general testimony about participating in the lineup, and the physical descriptions of the suspects that appear in the police report describing the robbery. (<u>Id.</u>) The fact that Arias identified Cairel, who is significantly taller than the person he originally described to police, tends to undercut his credibility. But it does not contradict evidence that he positively identified Cairel in the lineup. Alderden then contacted the Felony Review Unit of the Cook County State's Attorney's Office and ASA Elizabeth Ciaccia responded. (<u>See</u> Defs.' Stmt. ¶ 27.) Ciaccia interviewed Micetich, Arias, Cairel, and Johnson in Alderden's presence. (<u>Id.</u> at ¶¶ 29-31, 40.) Micetich confirmed his identification of Cairel and Johnson, and Arias confirmed his identification of Cairel. (<u>Id.</u> at ¶¶ 29-30.) Ciaccia wrote out Cairel's confessions to the two robberies, which Cairel signed. (<u>Id.</u> at ¶¶ 36-37.) It is undisputed that the police gave Cairel and Johnson food and beverages, and allowed them to use the washroom. (<u>Id.</u>) Cairel testified that Alderden told him that if "you help us out with this, we'll help you out and you could go home right after this." (Dep. of Jeremy Cairel ("Cairel Dep."), attached as Ex. 2 to Pls.' Stmt. of Add'l Facts, at 64; <u>see also</u> <u>id.</u> at 67, 68-69, 83, 85; Pls.' Resp. to Defs.' Stmt. ¶ 32.) The plaintiffs repeatedly cite

this testimony, and Cairel's learning disability, as grounds for denying that he confessed to the robberies. (<u>See</u> Pls.' Resp. to Defs.' Stmt. ¶¶ 32-36.) Cairel signed two written confessions, and during his deposition he explicitly testified that he told Ciaccia that he had robbed Arias. (<u>See</u> Cairel Dep. at 69.) At one point during his deposition, he appears to deny having told Ciaccia, Alderden, and Detective Johnson that he robbed Micetich, contrary to his signed confession. But the real thrust of his testimony seems to be that he did not understand what was happening and simply wanted to go home:

> Q. Okay. My specific question is did you tell the State's Attorney and Detective Alderden and the other officer that you had robbed Joseph Micetich?
>
> A. No. I don't remember everything that was going on with this. I just knew that they said one thing to me, saying if I helped them I would — they would help me, and I would be home, and that's all I was thinking about. I wasn't really paying attention to what they were saying, but she was writing down whatever Alderden — she was asking Alderden the same questions, too, and that's why his signature was on there, too.

(Cairel Dep. at 68-69.) This testimony does not contradict the defendants' claim that Cairel confessed to the robberies; it merely attempts explains why he did so when he believed that he was innocent. For his part, Johnson denies providing any verbal confession to the defendants, (<u>see</u> <u>supra</u>), and refused to sign a written statement implicating himself in the robberies. (<u>See</u> Pls.' Resp. to Defs.' Stmt. ¶ 40; Dep. of Marvin Johnson ("Johnson

Dep."), attached as Ex. 3 to Pls.' Stmt. of Add'l Facts, at 117-18.)

According to the defendants, neither Cairel nor Johnson ever told them, or Ciaccia, that they had an alibi. (See Defs.' Stmt. ¶ 38; see also Alderden Decl., attached as Ex. 22 to Defs.' Stmt., ¶ 4; Johnson Decl., attached as Ex. 26 to Defs.' Stmt., ¶ 11.) The plaintiffs dispute this statement, citing Johnson's testimony that he told the police officers at the scene of his arrest on January 24, 2007 that he was in the neighborhood to repossess a car. (See Pls.' Resp. to Defs.' Stmt. ¶ 38 (citing Johnson Dep. at 43).) Johnson's statement about his activities on January 24, 2007 does not constitute an alibi for a robbery that occurred the night before. They also cite Johnson's testimony that he repossessed cars and delivered them to Matteson on January 23, 2007. (See id. (citing Johnson Dep. at 22-24).) This statement does not contradict the defendants' contention that neither of the plaintiffs *told them* that they had an alibi. As for Cairel, the testimony that the plaintiffs rely on is vague. (See Cairel Dep. at 126 ("Q. Did you explain to [Detective Alderden] the repo activities that you and Marvin and Eric were involved with? A. Yes. There was paperwork for every night that we were out repo'ing.").) On the other hand, as we discussed before, Moore told Alderden that he, Cairel, and Johnson were in Matteson when Micetich was robbed. (See Moore Aff. ¶¶ 17-19, 24.) The

plaintiffs contend that neither Alderden nor any other officer reported this information to Ciaccia. (See Pls.' Stmt. of Add'l Facts ¶¶ 29-30.) The defendants quibble with this statement, pointing out that Ciaccia testified that she "could not remember interviewing Eric Moore or if [she] was told that he was in custody." (See Ciaccia Dep., attached as Ex. 4 to Pls.' Stmt. of Add'l Facts, at 83.) First, there is no evidence that she did speak with Moore. Second, she stated in her deposition that she would have wanted to speak with him if she had known that he had provided an alibi for the plaintiffs. (See Ciaccia Dep. at 84 ("I would have wanted to talk to Eric Moore if I knew he existed as an alibi witness, that is correct.").) The plaintiffs' attorney posed the question as a hypothetical, but it was consistent with the facts: Alderden knew that Moore had said that he, Cairel, and Johnson were in Matteson when Micetich was robbed. The plaintiffs are entitled to the inference that the defendants did not tell Ciaccia that Moore had provided an alibi for the plaintiffs. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999) (On summary judgment, we construe the evidence in the light most favorable to the non-moving party.). Based on the information that was available to her, Ciaccia made the decision to charge Cairel with one count of armed robbery, one count of aggravated robbery, and two counts of aggravated "false personation of a peace officer;" she charged Johnson with one count of aggravated robbery

and one count of aggravated "false personation of a peace officer."
(Defs.' Stmt. ¶¶ 41-42.)  Cairel and Johnson were released on bond
on January 26, 2007.  (See Cairel Dep. at 94; Johnson Dep. at 90;
Cairel Arrest Report, attached as Ex. 10 to Defs.' Stmt. of Facts,
at 4; Johnson Arrest Report, attached as Ex. 32 to Defs.' Stmt., at
4).)  Moore, who was not identified by either victim, was released
that same day without charges.  (See Case Supp. Report, dated Feb.
23, 2007, at FCRL000149.)

    Alderden began to doubt Cairel's confession after further
investigation.  He obtained records from F3 Solutions indicating
that some individuals whom Cairel claimed to have robbed[6] were
actually debtors from whom Cairel and Moore had repossessed
vehicles.  (See Defs.' Stmt. ¶ 51.)  Alderden testified that he
made this discovery at some point before February 23, 2007.  (See
Alderden Dep. at 124.)  On April 12, 2007, Alderden arrested Joseph
Hatzell, a 5'8" male, for a robbery committed on December 20, 2006
in the same area where Micetich and Arias were robbed.  (See Defs.'
Stmt. ¶ 52.)  Hatzell impersonated a police officer, pulled over
the victim's car, and stole money from him.  (Id.)  Alderden showed
Hatzell photographs of Micetich and Arias.  (Id. at ¶ 53.)  Hatzell
said that he had never seen Micetich, but that he was "75% sure"
that he had robbed Arias.  (Id.)  Alderden contends that he shared

----

    [6]  The plaintiffs deny that Cairel confessed to any robbery, but the
evidence they cite does not support their denial.  There is no dispute that
Cairel initially denied committing any crime, (see, e.g., Cairel Dep. at 126-27),
but he later signed written confessions admitting multiple robberies.

his misgivings about Cairel's guilt with the plaintiffs' prosecutor, Dan Groth. (Id. at ¶ 54.)[7] He later shared the same information with ASA Geraldine D'Souza, who took over the case from Groth, and with D'Souza's supervisors. (Id. at ¶¶ 55.)[8] After conducting its own independent investigation, the Cook County State's Attorney dismissed the charges against Cairel in March 2008. (See Pls.' Stmt. of Add'l Facts ¶ 37.) Johnson was permitted to withdraw his guilty plea and all charges against him were dismissed. (Id.) Micetich is "still absolutely sure that Jeremy Cairel and Marvin Johnson are the men who robbed me on January 23, 2007." (Micetich Aff. ¶ 16.)

## DISCUSSION

Cairel and Johnson have filed a five-count complaint alleging violation of their due process rights (Count I), conspiracy (Count II), malicious prosecution (Count III), IIED (Count IV), and indemnification (Count V). The defendants have moved for summary judgment on all of plaintiffs' claims.

## A. Legal Standard

---

[7] The plaintiffs deny that Alderden contacted Groth, but the evidence they cite does not contradict his testimony. Groth's case notes do not record any conversation with Alderden. (See Pls.' Resp. to Defs.' Stmt. ¶ 54.) But we have no reason to believe that Groth's notes are exhaustive. The plaintiffs also cite testimony from Weisberg, Cairel's criminal defense attorney. (Id.; see also Weisberg Dep., attached as Ex. 6 to Pls.' Stmt. of Add'l Facts, at 22-29.) The fact that Weisberg spoke with Groth and others at the State's Attorneys' Office about defects in the case against his client does not mean that Alderden did not speak to Groth and others about the same subject.

[8] The plaintiffs deny this statement as well. For the reasons explained in the preceding footnote, the plaintiffs' evidence is insufficient to create a material factual dispute about what Alderden told prosecutors.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi, 184 F.3d at 714. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

## B.  Due Process (Count I)

A plaintiff may not bring a § 1983 claim for malicious prosecution because Illinois tort law provides an adequate remedy. See Newsome v. McCabe, 256 F.3d 747, 750-51 (7th Cir. 2001).[9] The

---

[9]/  The exact parameters of this rule are unsettled after Whitlock v. Brueggemann, 682 F.3d 567 (7th Cir. 2012) and Fields v. Wharrie, 740 F.3d 1107 (7th Cir. 2014). These cases open the door to a due-process claim based upon the defendant's use of fabricated evidence to secure the plaintiff's conviction and incarceration. See Bianchi v. McQueen, No. 12-cv-00364, 2014 WL 700628, *10-12 (N.D. Ill. Feb. 24, 2014). In this case, the plaintiffs were never

defendants argue that the only other possible claim based upon the conduct alleged in Count I is false arrest, making the plaintiffs' claim untimely: they filed their complaint more than two years after their arrests.  See <u>Ray v. Maher</u>, 662 F.3d 770, 772-73 (7th Cir. 2011) (In Illinois, § 1983 claims are governed by the two-year statute of limitations applicable to personal-injury suits).  The plaintiffs counter that they have alleged timely, "free standing" due process claims based upon the defendants': (1) failure to disclose Moore's alibi to Ciaccia; (2) coercive interrogation of a mentally-impaired suspect; and (3) tampering with witness statements and identification procedures.  We will address each of these theories in turn.

**1.   Defendants' Failure to Disclose an Alibi Witness to the Prosecutor**

Our Court of Appeals has recognized an "exception" to the rule barring § 1983 malicious-prosecution claims for claims based on <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  <u>See</u> <u>Ray v. City of Chicago</u>, 629 F.3d 660, 664 (7th Cir. 2011) (The Court has "permitted individuals to file Section 1983 suits alleging that they have been denied a fair trial because the state has failed to provide them with access to material exculpatory evidence.").  The problem with the plaintiffs' <u>Brady</u> claim is that the state dropped the charges

---

convicted.  So, they will have to find some other legal basis to establish a constitutional claim.  <u>See</u> <u>id.</u> at 12 (holding that a claim based upon prosecution without probable cause still does not support a constitutional claim after <u>Whitlock</u> and <u>Fields</u>).

against them before trial.[10]  As the plaintiffs point out, our Court
of Appeals has suggested in some cases that it might recognize a
Brady claim brought by a plaintiff who was acquitted of the charges
against him.  See Mosley v. City of Chicago, 614 F.3d 391, 397 (7th
Cir. 2010); Bielanski v. County of Kane, 550 F.3d 632, 644-45 (7th
Cir. 2008).  But those cases expressly reserved ruling on that
question.  See Mosley, 614 F.3d at 397; Bielanski, 550 F.3d at 644-
45.  More recently, the Court held that a plaintiff could not
pursue a Brady claim because the state dropped the charges against
her before trial.  See Ray, 629 F.3d at 664 ("Ray has failed to
identify a single instance, however, where we have allowed [a Brady
claim] when the individual is merely charged with a crime, but
never fully prosecuted.").  The Court suggested in Alexander v.
McKinney, 692 F.3d 553, 556 (7th Cir. 2012) that this may still be
an open question in this Circuit.  See id. ("[W]e have entertained
the possibility that prejudice could be established if an acquitted
defendant showed that disclosure of the suppressed evidence would
have altered the decision to go to trial.").[11]  But this dicta,

---

[10]/  The defendants argue that the plaintiffs' Brady claim is an improper
"hybrid" false arrest/malicious prosecution claim.  Cf. Brooks v. City of
Chicago, 564 F.3d 830, 833 (7th Cir. 2009) ("A plaintiff cannot state a due
process claim 'by combining what are essentially claims for false arrest under
the Fourth Amendment and state law malicious prosecution into a sort of hybrid
substantive due process claim under the Fourteenth Amendment.'") (quoting McCann
v. Mangialardi, 337 F.3d 782, 786 (7th Cir. 2003)).  It is unnecessary to reach
this argument for the reasons we are about to explain.

[11]/  The Alexander Court did not cite Ray.

which is itself a gloss on dicta from earlier cases, is not grounds to depart from Ray's express holding.

We respectfully disagree with the court's decision in Quiroz v. Hall, No. 2:12-CV-212, 2012 WL 6019283, (N.D.Ind. Dec. 3, 2012). The Quiroz court concluded that it is still an open question in this Circuit whether an acquitted plaintiff can pursue a Brady claim under § 1983. Id. at *7-8 (citing Mosley, 614 F.3d at 396-97). Ray was distinguishable, the court reasoned, because in that case the state dismissed the charges against the plaintiff at her first post-arrest hearing. Id. at *8. By contrast, the plaintiff in Quiroz was "prosecuted for 18 months before the charges were dismissed." Id. We do not see any basis in Ray for recognizing a Brady claim in some instances, but not others, depending on the length of the plaintiff's prosecution before dismissal. Ray's holding is based upon the Court's recognition that Brady protects a trial right. See, e.g., Chagolla v. City of Chicago, No. 07 C 4557, 2012 WL 403920, *6 (N.D. Ill. Feb. 8, 2012) ("[T]he Seventh Circuit has consistently considered the right to exculpatory and impeachment evidence protected by Brady to focus on the criminal trial."). Neither Cairel nor Johnson went to trial — Cairel, because the state dropped the charges against him; Johnson, because he pled guilty. The Chagolla court, citing Ray, held that the defendants were entitled to summary judgment on the plaintiff's Brady claim because he never went to trial. See id. We agree with

the <u>Chagolla</u> court's analysis, and respectfully disagree with <u>Quiroz</u>. Applying <u>Ray</u>, the defendants are entitled to summary judgment on Count I insofar as it is based on <u>Brady</u>.

### 2. Cairel's Interrogation

The plaintiffs argue that Count I can also be construed to assert a substantive due process claim based upon the defendants' coercive interrogation of a mentally-impaired suspect. <u>See</u> <u>Wallace v. City of Chicago</u>, 440 F.3d 421, 429 (7th Cir. 2006) (Interrogation tactics that "shock the conscience" may support a substantive due process claim.). There are two fundamental problems with Cairel's claim. First, any claim based upon Cairel's interrogation accrued at that time. In <u>Gonzalez v. Entress</u>, 133 F.3d 551, 555 (7th Cir. 1998), the plaintiff claimed that the defendants used excessive force to extract a false confession. The Court held that the plaintiff's injury was "immediately actionable." <u>Id.</u> at 555 ("Application of excessive force at a police station violates the Constitution and is immediately actionable, even if the prosecutor never tries to use the confession at trial . . . ."). It entertained the possibility that a plaintiff might be able to state a separate constitutional claim if the state introduced the plaintiff's false confession at trial. <u>See</u> <u>id.</u> ("[T]he use of a coerced confession could be a violation separate from the coercion, and efforts by the police to conceal vital facts from the prosecutor and court in order to frame an

innocent person could be still another violation."). But the
plaintiff in <u>Gonzalez</u> had successfully moved to suppress his
confession, so his one and only injury occurred when the
interrogation took place. <u>Id.</u> Here, the state did not introduce
Cairel's confession at trial because there was no trial. Applying
<u>Gonzalez</u>'s reasoning, Cairel's claim accrued when he was
interrogated, more than two years before he filed his complaint.
So, his substantive due process claim is time-barred.

We hold in the alternative that the record does not support a
finding that the defendants' conduct shocks the conscience. "There
is no clear-cut analysis to determine what constitutes
'conscience-shocking' conduct; the question is whether the conduct
is 'too close to the rack and the screw.'" <u>Fox v. Hayes</u>, 600 F.3d
819, 841 (7th Cir. 2010) (quoting <u>Rochin v. California</u>, 342 U.S.
165, 172 (1952)). "For example, on the one hand, forcing an
emetic down a person's throat to forcibly extract evidence from a
suspect's stomach shocks the conscience, <u>see</u> [<u>Rochin</u>, 342 U.S. at
172], but on the other hand, lying to, threatening, or insulting a
suspect does not, <u>see</u> <u>Tinker v. Beasley</u>, 429 F.3d 1324, 1329 (11th
Cir. 2005)." <u>Id.</u> Cairel accuses the defendants of lying to him,
asking him the same questions "over and over again," and falsely
promising that he could go home if he confessed. (<u>See</u> Pls.' Stmt.
of Add'l Facts ¶ 14.) This is not "conscience-shocking" behavior,
objectively speaking. <u>See</u> <u>Fox</u>, 600 F.3d at 841. Cairel's mental

impairment is certainly relevant, but the defendants' expert witnesses both state that his condition would not have been apparent to the defendants. Cairel has not cited any contrary medical opinion. Instead, he relies on (1) his criminal defense attorney's lay opinion that Cairel appears "slow," and (2) Moore's statement that he told defendants that Cairel "was in special education classes and had learning disabilities." (<u>See</u> Moore Aff. ¶ 21; <u>see also</u> Pls.' Stmt. of Add'l Facts ¶ 1 (stating that Cairel "took five (5) years of special education classes in high school").) This testimony is insufficient to create a material factual dispute about whether Cairel, a gainfully employed 30-year-old man, appeared to the defendants capable of making a truthful confession in response to ordinary interrogation tactics. Even if Cairel's substantive due process claim was timely, the defendants would be entitled to summary judgment.

### 3. Tampering With Witness Statements and Identification Procedures

Finally, the plaintiffs contend that their due-process claim is supported by evidence that the defendants tampered with witness statements and identification procedures. This argument is legally and factually deficient. Suggestive or coercive identification procedures are not unconstitutional in themselves. <u>See</u> <u>Alexander v. City of South Bend</u>, 433 F.3d 550, 555 (7th Cir. 2006) ("The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of

quality.").  They are only unconstitutional if they prevent the defendant from receiving a fair trial.  Id.  ("South Bend cannot be liable under § 1983 unless Alexander shows how the flaws in South Bend's identification techniques made his trial unfair.").  Because Cairel and Johnson never went to trial, the circumstances of their identification cannot support a constitutional claim.  See Hensley v. Carey, 818 F.2d 646, 650 (7th Cir. 1987) (The plaintiff "could not possibly have been deprived of his right to a fair trial since he was never tried.").  Even if the plaintiffs had gone to trial, there is no evidence that the defendants manipulated identification procedures or tampered with witnesses.  The plaintiffs' physical characteristics differed — sometimes substantially — from the descriptions of the suspects that Arias and Micetich originally gave police. (See Pls.' Stmt. of Add'l Facts ¶¶ 23-24.)  The cars the plaintiffs were driving did not match the car that Micetich had described the night before.  (Id. at ¶ 25.)  And it appears that the police missed an opportunity to investigate a promising lead when they failed to show Delamora to Micetich.  (Id. at ¶ 26.)  The plaintiffs' theory appears to be that, given these circumstances, the defendants must have improperly influenced Micetich and Arias to identify Cairel and Johnson.  This is pure speculation.  Cf. Wooden-Ousley v. City of Chicago, 393 Fed.Appx. 378, 380-81 (7th Cir. 2010) ("It is true that Wooden-Ousley was 10 inches taller and 55 pounds heavier than the description of the carjacker that

Palomino and Salgado gave at the crime scene. But at most the discrepancy suggests that, during a brief encounter at gunpoint, the victims of a violent crime may have trouble accurately estimating their assailant's height and weight; it does not suggest that Detective Mendez manipulated the identification procedures.").

In sum, all of the plaintiffs' due-process theories are deficient and the defendants are entitled to summary judgment on Count I.

## C.  Conspiracy (Count II)

Count II alleges that the defendants conspired to violate the plaintiffs' rights under the Fourth and Fourteenth Amendments.  In light of our ruling on Count I, the defendants are also entitled to summary judgment on Count II.  See Smith v. Gomez, 550 F.3d 613, 617 (7th Cir. 2008) ("[C]onspiracy is not an independent basis of liability in § 1983 actions.").

## D.  Malicious Prosecution (Count III)

"The elements of malicious prosecution in Illinois are (1) commencement of criminal proceedings by the defendants; (2) termination of that matter in favor of the plaintiff; (3) the absence of probable cause for the proceedings; (4) the presence of malice; and (5) resulting damages." Williams v. City of Chicago, 733 F.3d 749, 759 (7th Cir. 2013).  The defendants rely on the Illinois Tort Immunity Act for the proposition that their actions must also be "willful and wanton" to support liability.  See 745

ILCS 10/2-202 ("A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct.").[12]

"In a malicious prosecution case, probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." <u>Williams</u>, 733 F.3d at 759. Arias identified Cairel as one of the individuals who robbed him. The suspects Arias originally described were substantially shorter than the 6'5" Cairel (5'2" and 5'8" to 5'10", respectively). (<u>See</u> Pls.' Stmt. of Add'l Facts ¶ 23.) Assuming that this discrepancy was sufficient to require further investigation, the defendants satisfied this obligation by interrogating Cairel and obtaining his written confession to the robbery. As we discussed before, there is no evidence that the defendants knew, or should have known, that Cairel's disabilities caused him to confess falsely. The only relevant evidence in the record is to the contrary. Finally, the plaintiffs have not cited any evidence indicating that defendants knew that Cairel had an alibi for *Arias's robbery* — Moore's statement to Alderden, and the

---

[12]/ "Arguably, there is a more specific immunity provision that applies to law enforcement, which essentially mirrors and codifies the malicious prosecution standard." <u>Holland v. City of Chicago</u>, 643 F.3d 248, 255 (7th Cir. 2011); <u>see</u> 745 ILCS 10/2-208 ("A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause."). In this case, the analysis and outcome is the same under either § 2-202 or § 2-208.

documents police obtained from F3 Solutions, do not indicate Cairel's whereabouts on December 20, 2006. We conclude that the defendants had probable cause to charge Cairel with Arias's robbery.

There are fewer discrepancies in Micetich's identification of the plaintiffs as the men who robbed him. He originally described two male assailants: (1) a 5'6", 150 pound African American male; and (2) a 6'0", 190 pound "White-Hispanic" male with a light complexion. (See Pls.' Stmt. of Add'l Facts ¶ 24.) The plaintiffs argue that Johnson did not match Micetich's description, but the differences were minor. (See Pls.' Stmt. of Add'l Facts ¶ 24 (describing Johnson as a 5'9," 150 pound African American male)); see also Pasiewicz v. Lake County Forest Preserve Dist., 270 F.3d 520, 525 (7th Cir. 2001) ("Although Pasiewicz's appearance did not match exactly the characteristics provided by the two women, he bore a fair resemblance."). We accept for purposes of the defendant's motion that Micetich waffled at the scene of the traffic stop, but it is undisputed that Micetich told Alderden that he was "absolutely sure" that Cairel and Johnson had robbed him. (Id. at ¶ 18.) He is still "absolutely sure." (See Micetich Decl. ¶ 16.) Cairel is 5 inches taller than the individual that Micetich originally described, but his complexion (white versus "White-Hispanic"/light complexion) and weight (190 pounds versus 180 pounds) were similar. And again, Cairel confessed to robbing

Micetich, and in doing so implicated Johnson.  The fact that Moore gave the plaintiffs an alibi for their whereabouts on January 23, 2007 does not negate probable cause.  The defendants were not required to credit his statement over Cairel's confession and Micetich's identification.  And the evidence that the police officers obtained from F3 Solutions did not conclusively establish that the plaintiffs were in Matteson when Micetich was robbed.  We conclude that the defendants are entitled to summary judgment on the plaintiffs' claim for malicious prosecution.

## E.    IIED (Count IV)

The defendants argue that the plaintiffs' IIED claims are barred by the statute of limitations and, in the alternative, substantively deficient.  The parties agree that the Illinois Immunity Act's one-year statute of limitations governs the plaintiffs' IIED claims, See 745 ILCS 10/8-101, but disagree about when the plaintiffs' claims accrued.  Prior to Evans v. City of Chicago, 434 F.3d 916, 934-35 (7th Cir. 2006) (*overruled on other grounds* by Hill v. Tangherlini, 724 F.3d 965, 967-68 (7th Cir. 2013)), courts in this district "consistently held" that IIED claims based on malicious prosecution accrue when the underlying criminal case is terminated.  Carrocia v. Anderson, 249 F.Supp.2d 1016, 1028 (N.D. Ill. 2003).  In Evans, the Court held that the plaintiff's IIED claim accrued when the defendants last interacted with him:

It is undisputed that the last, confirmed interaction between Evans and the police officers named in the complaint took place sometime in December of 1997. Thus, the last injury Evans suffered, and indeed the last possible date of a tortious act against Evans, was in December of 1997, well beyond both the two-year statute of limitations for § 1983 claims and the one-year statute of limitations for tort claims against governmental entities or employees.

See id. at 935 (footnote omitted).  For a time, there was a split of authority about whether Evans overturned what had been the majority rule in this district.  Compare Bridewell v. City of Chicago, No. 08 C 4947, 2012 WL 2458548, *2 (N.D.Ill. Jun 27, 2012) (construing Evans to reject the line of authority described in Carrocia); with Hobbs v. Cappelluti, 899 F.Supp.2d 738, 762-63, n. 16 (N.D. Ill. 2012) (holding that Evans did not repudiate the majority rule in this district).  Our Court of Appeals resolved this conflict in Bridewell v. Eberle, 730 F.3d 672, 678 (7th Cir. 2013), a case that neither side has cited.  The Bridewell Court held that an IIED claim based on malicious prosecution "accrues on the date of the arrest."  Id. (citing Evans, 434 F.3d at 934).  The mere continuation of the prosecution is insufficient to "restart" the statute of limitations.  See id. ("The idea that failing to reverse the ongoing effects of a tort restarts the period of limitations has no support in Illinois law — or in federal law either.") (collecting cases).  The Court appears to at least entertain the possibility that a new IIED claim might arise later.  See id. ("Even if we were to suppose that a new claim could in

principle be based on events after the initial injury, Bridewell's claim would fail because she does not contend that the detectives' ongoing failure to alert the prosecutor to the potential shortcomings in the evidence was motivated by a freshly formed intention to cause emotional distress."). But here, as in Bridewell, there is no evidence that the defendants did anything after January 26, 2007 that might support a "new" IIED claim. See id. at 678-79 ("Bridewell wants to treat the (allegedly) bad intent with which the prosecution began as extending to all later inaction. Yet if the initial intent carries forward, so does the initial date of the claim's accrual."). Applying Eberle, the plaintiffs' IIED claim is time-barred.

In the alternative, we conclude that the defendants' conduct was not "extreme and outrageous" as the tort requires. Duffy v. Orlan Brook Condominium Owners' Ass'n, 981 N.E.2d 1069, 1079 (Ill. Ct. App. 2012) ("[E]xtreme and outrageous behavior requires conduct that goes beyond all possible bounds of decency, such that a reasonable person would hear the facts and be compelled to feelings of resentment and outrage."). For purposes of the defendants' motion, we will assume that the defendants did not tell Ciaccia that Moore had said that the plaintiffs were with him in Matteson when Micetich was robbed. Moore's statement was certainly relevant to the probable cause inquiry, but it must be evaluated in context. Cairel confessed to robbing Micetich with Johnson, and Micetich

independently identified Cairel and Johnson as the perpetrators. This evidence was sufficient to establish probable cause to charge the plaintiffs with robbery and impersonating a police officer. (See supra.) The defendants investigated Moore's alibi, and reasonably concluded that it was not sufficient to defeat probable cause: the only repossession documents in the record are not time-stamped. Under the circumstances, failing to share Moore's statement with Ciaccia does not amount to "extreme and outrageous behavior . . . beyond all possible bounds of decency." Duffy, 981 N.E.2d at 1079.

**F.   Indemnification**

The City of Chicago is entitled to summary judgment on the plaintiffs' claim for indemnification because we have concluded that the individual defendants are entitled to summary judgment on all of the plaintiffs' claims.

<u>CONCLUSION</u>

The defendants' motions for summary judgment [109, 126] are granted.


DATE:     March 6, 2014



ENTER:    _____

- 33 -

John  F.  Grady,  United  States  District  Judge